[Crim. No 6089. First Dist., Div. One. May 21, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. FREDERICK
RUPERT CHANDLER, Defendant and Appellant.

Frederick Rupert Chandler, in pro. per., and George E. McKerrow, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Robert R. Granucci, Joyce F. Nedde, and John F. Henning, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

ELKINGTON, J.—Frederick Rupert Chandler, defendant below, appeals from a judgment of conviction of armed robbery (Pen. Code, § 211) entered upon a jury verdict.

Insisting that his arrest and an ensuing search were without probable cause he contends error: (1) on the admission in evidence of a knife found in the search, (2) in the use of a tape recording of a conversation between defendant and an accomplice while alone in a police car after their arrest, and (3) in allowing the testimony of a juvenile accomplice who had shortly after the arrest incriminated himself and his companions. Each of these, he says, is "the fruit of the poisonous tree," the illegal arrest.

Discussing the question of reasonable cause for arrest, our Supreme Court in *People* v. *Ingle,* 53 Cal.2d 407, 412 [2 Cal. Rptr. 14, 348 P.2d 577], has said: "There is no exact formula for the determination of reasonableness. Each case must be decided on its own facts and circumstances. . . . Reasonable cause has been generally defined to be such a state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime. [Citations.] Probable cause has also been defined as having more evidence for than against; supported by evidence which inclines the mind to believe, but leaves some room for doubt.''

We proceed to a discussion of the evidence introduced at the trial relating to the issue of probable cause for defendant's arrest.

On the early morning of July 14, 1966, a team of two police officers received successive reports of service station robberies. Each was reported as perpetrated by a single individual who was armed with a knife. The getaway car of the second robbery was described as a "light colored station wagon." At 4:45 a.m., while in a coffee shop on Winchester Road with their radio "walkie talkie," the officers received a report that another service station robbery had just occurred at Central and Hamilton Avenues. The perpetrator was described as a male Caucasion and the vehicle as a light colored sedan which was last seen proceeding north on Central Avenue. The officers ran to their vehicle where they almost immediately received a message that the robbery car was now described as

a *"light colored compact station wagon,* possibly a Dodge Dart." Winchester Road is approximately three blocks west of Central Avenue. These streets run north and south and parallel to each other. At the time of the latest report the officers were three or four blocks from Hamilton Avenue and about six or seven blocks from the robbery location. They knew that proceeding north on Central Avenue the getaway car could not turn east because of a freeway. It would necessarily have to continue straight ahead or turn west on a cross street toward Winchester Road. The first and second cross streets north of Hamilton Avenue were respectively David Avenue and Payne Avenue. To intercept the robbery car the officers drove south on Winchester Road and then chose to turn east on Payne Avenue toward Central Avenue. As they turned they saw headlights of an approaching automobile. They stopped and as the other car drove by they observed that it was a *"light colored compact station wagon"* occupied by three men. The officers stopped the car and arrested the occupants, one of whom was the defendant here. At the scene the car was searched, disclosing a knife.

Defendant relies upon the frequently cited case of *People* v. *Mickelson,* 59 Cal.2d 448 [30 Cal.Rptr. 18, 380 P.2d 658]. We do not think that case is here applicable. There the police did not know that the robbers had an automobile, and the car which they stopped was being driven *toward* the scene of the crime a considerable time after its commission. And in considering the totality of circumstances of *Mickelson* it is significant to note that after the arresting policeman "had talked to [the car's occupants] he was satisfied that they had not been involved in the robbery." (P. 454.) Nevertheless the car was thereafter searched. Such a search of an automobile, after the officer's suspicion had vanished, was clearly not reasonable.

*People* v. *Schader,* 62 Cal.2d 716 [44 Cal.Rptr. 193, 401 P.2d 665], presents a factual situation similar to that of the case before us. A policeman received a radio report of a robbery and murder. The suspects were reported as heading out of the city in a "late model . . . Cadillac." The officer parked on a freeway off-ramp on the culprits' suspected line of travel. A "late model . . . Cadillac" appeared. In addition the officer stated that he believed that the youthful appearance and informal dress of the driver of the car presented a suspicious circumstance. Also the speed of the Cad-

illac was reduced when the officer began following it. The court stated that the officer "was under no compulsion to investigate further before making an arrest. *His immediate duty was to arrest the driver of the suspect vehicle, disarm him of any weapons, with a minimum of risk to his own personal safety, and proceed with his investigation.*" (P. 723; italics added.)

Defendant emphasizes that the robberies were reported as perpetrated by one person while the "light colored compact station wagon" contained three men. We consider this of no significance. It is common knowledge that frequently, perhaps more often than not, where an automobile is used as a robbery getaway car, one or more persons remain in the vehicle. It might be noted that in *People* v. *Schader, supra,* 62 Cal.2d 716, the officer had a report of *robbers* escaping in an automobile while, as the suspected car drove by, only one person, the driver, was visible. (Pp. 720-721.)

█ We conclude that the officers had probable cause for the arrest of the occupants of defendant's car, and for its incidental search. The evidence here—an armed robbery a few blocks away in the early morning hours, with defendant's car answering the reported description being seen by the police minutes, possibly seconds, later, traveling away from the robbery on one of the nearest available exits from Central Avenue—would, we believe, lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the car's occupants had been involved in the robbery. █ The arrest being valid, and the search of the automobile being reasonably incidental thereto (see *People* v. *Webb,* 66 Cal.2d 107 [56 Cal.Rptr. 902, 424 P.2d 342]), defendant's three principal assignments of error are without merit.

█ It is further urged that the juvenile's earlier statement to the police (which was not in evidence) was tainted by virtue of the rule of *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. For this reason also, it is contended that his trial testimony was inadmissible. We have considered this argument which is unsupported by authority. Assuming *arguendo* that there was a *Miranda* violation, we hold that such does not prevent the juvenile's later voluntary in-court testimony on the subject matter of the invalid statement. It is not at all clear that but for such alleged violation the juvenile would not have testified. His

voluntary testimony appears sufficiently an act of free will to purge the primary taint of any unlawful police conduct. As the United States Supreme Court stated in *Wong Sun* v. *United States,* 371 U.S. 471, 487-488 [9 L.Ed.2d 441, 445-456, 83 S.Ct. 407], "not . . . all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' '' (See also *People* v. *Sesslin,* 68 Cal.2d 418, 427 [67 Cal.Rptr. 409, 439 P.2d 321].)

Defendant asserts another ground of error in the taking and use in evidence of the incriminating voice recording. He states that it was violative of Penal Code section 653j[1] relating to the recording of a confidential communication. It appears that defendant and his accomplice were under arrest, handcuffed and seated in the back of a police car at the time the recording was taken. They had been advised of the charges against them. Furthermore, defendant testified that at the time of the conversation with his accomplice he knew it was being recorded. Section 653j provided that the prohibition of recorded conversations should not be ''construed as prohibiting law enforcement officers from doing that which they are otherwise authorized by law to do,'' and that it was not applicable to circumstances in which the parties to the recorded ''communication may reasonably expect that the communication may be overheard or recorded.'' It thus is apparent that there was no violation of section 653j.

Defendant also claims a violation of his constitutional right of privacy in the recording of the conversation in question. It is now settled law that an inmate of a jail or prison may not successfully complain of such a recording even if its taking was not known to him at the time. In *People* v. *Miller,* 252 Cal.App.2d 877, 881 (fn. 2) [60 Cal.Rptr. 791] we said: ''It is well established, moreover, 'that a jail shares none of the attributes of privacy of a home, an automobile, an office or a hotel room' (*Lanza* v. *New York,* 370 U.S. 139, 143 [8 L.Ed.2d 384, 387, 82 S.Ct. 1218]) ; that inmates of prisons do not have the usual array of federal and state constitutional

---

[1]Repealed 1967 and reenacted in substance as Penal Code sections 632-634.

rights guaranteed to nonincarcerated citizens. (*Price* v. *Johnston*, 334 U.S. 266, 285 [92 L.Ed. 1356, 1369, 68 S.Ct. 1049]; *In re Ferguson*, 55 Cal.2d 663, 670-671 [12 Cal.Rptr. 753, 361 P.2d 417]; *Davis* v. *Superior Court*, 175 Cal.App.2d 8, 20 [345 P.2d 513]; *People* v. *Hernandez*, 229 Cal.App.2d 143, 149 [40 Cal.Rptr. 100]); and that prison authorities may subject inmates to intense surveillance and search unimpeded by Fourth Amendment barriers. (*Lanza* v. *New York, supra*; *People* v. *Hernandez, supra*.) In *People* v. *Morgan*, 197 Cal.App.2d 90, 92-94 [16 Cal.Rptr. 838] (cert. den. 370 U.S. 965 [8 L.Ed.2d 830, 82 S.Ct. 1606]) it was held that an electronic recording of conversation between a county jail prisoner and his sister was not an illegal search and seizure nor an unlawful invasion of the prisoner's privacy. The court stated as follows: 'A man detained in jail cannot reasonably expect to enjoy the privacy afforded to a person in free society. His lack of privacy is a necessary adjunct to his imprisonment.' (P. 93.) In *People* v. *Lopez*, 60 Cal.2d 223, 248 [32 Cal.Rptr. 424, 384 P.2d 16], it was held that 'Except only insofar as concerns consultation with his attorney in a room designated for that purpose, a prisoner has no right of privacy in a jail.' " (See also *People* v. *Apodaca*, 252 Cal.App.2d 656, 658-659 [60 Cal.Rptr. 782].) Reasonably the right of defendant to privacy while under valid arrest in a police car can be no greater than if he were confined in jail.

 Finally defendant urges that the testimony of the juvenile accomplice was error for reasons not related to the arrest or the *Miranda* rule. It is contended that the minor had been promised leniency and immunity, and that "psychological coercion" attended his testimony. Since such matters would affect only the weight of the minor's testimony and not its admissibility, no error appears.

The judgment is affirmed.

Molinari, P. J., and Sims, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 17, 1968.