[Crim. No. 17140. Second Dist., Div. Two. Mar. 17, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
VINCENT CALIFANO, JR., Defendant and Appellant.

**COUNSEL**

Rivera & Wallace and James A. Wallace for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, Jack K. Weber and James H. Kline, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**HERNDON, J.**—Appellant Vincent Califano and his codefendant John Totoro were found guilty of second degree burglary following a stipulation that the cause would be submitted upon the transcript of the testimony taken at the preliminary hearing. After announcing his verdict the trial judge ordered that proceedings be suspended and granted the defendants probation for two years. Califano's notice of appeal from the judgment presents for review the order granting him probation. (Pen. Code, § 1237.)

Appellant has stated his three assignments of error as follows: (1) The electronically monitored conversation between appellant and his codefendant Totoro was improperly admitted into evidence in violation of appellant's constitutional rights; (2) the evidence is insufficient to support the conviction; and (3) the arrest of appellant was illegal and therefore any evidence gained subsequent thereto is tainted and inadmissible.

### Summary of the Evidence

Three witnesses testified at the preliminary hearing: Jim Purgason, the manager of the establishment which had been burglarized, Curtis Ward, the assistant manager, and Daniel Shea, a police officer of the Long Beach Police Department assigned to the detective bureau. The more significant of the facts proved by their testimony will be summarized.

Jim Purgason was the manager of Big John's Pizza Parlor in the City of Long Beach. On the morning of May 27, 1968, he arrived at the parlor and found that the office had been ransacked. Upon further inspection, he discovered that money was missing from the filing cabinets. Also missing was the lid-type combination door to the floor safe and the safe's contents of approximately $3,700.

Daniel Shea was a police officer for the City of Long Beach. In the course of his investigation of the burglary, he contacted John Purgason, the owner of the pizza parlor, and suggested that all his employees who had the combination to the safe take a polygraph examination.

Defendant John Totoro was an employee who had possession of keys to the pizza parlor and knew the combination to the safe. On June 5, 1968, he went to the Long Beach police station and took a polygraph examination. He denied having any knowledge of the burglary. At the request of the investigating officers, Totoro returned to the police station on June 6, 1968.

Curtis Ward also was an employee at the pizza parlor and had been questioned by the police concerning the burglary. According to the testimony of Officer Shea, Ward told the police that the burglary had been committed by Totoro and a person known to him only as "Vince." On June 6, 1968, Ward returned to the police station where he met Totoro and in the presence of the officers said, "It's all over, John . . . I have told the police everything that has happened." Totoro then explained to the officers that appellant was "Vince" and that he and appellant had committed the burglary. He also stated that he had $1,500 of the money in a roommate's safe deposit box, that $500 was earmarked to be given to

Curtis Ward, and that the money was divided up at a house in Garden Grove or Westminster.[1]

The officers asked Totoro to direct them to the residence of his accomplice. Totoro said that he could not give them the address, but that he could show the officers where the house was located. Totoro then directed the officers to appellant's house in Orange County.

Upon arrival at appellant's house Totoro asked the officers to allow him to go in first and attempt to persuade appellant to surrender himself. After waiting approximately 15 minutes, the officers went to the door and knocked. Appellant appeared and stepped out on the porch. The officers asked him whether he knew why they were there. He responded that Totoro had told him. After being advised of his constitutional rights and asked whether or not he wished to talk to the officers, appellant stated that he wanted to talk to an attorney. Appellant was then placed under arrest and taken to the police station.

At the police station Totoro and appellant were placed in an interview room and the door closed. This room was equipped with a hidden microphone which permitted the officers to listen. The following conversation was related by Officer Shea: "*Totoro:* They [the police] are probably listening right now. [Laughter.] . . . *Appellant:* What in the hell are we doing here? . . . *Totoro:* Curtis Ward told them that we did it. . . . *Appellant:* What did the son of a bitch tell them that for? . . . *Totoro:* I don't know, but he did. That is not important now. The important thing is we have got to get off as light as we can. . . . *Appellant:* How did they find my place? . . . *Totoro:* I told them. . . . That is why they let me go in first, to try to get you to surrender. We are in deep and we have got to get ourselves out. . . . *Appellant:* Why did that son of a bitch Curt say anything? That is stupid. . . . *Totoro:* That is not important. The important thing is we got caught and we have got to get out. . . . Have you still got your money? . . . *Appellant:* No, but I can get most of it back, all but about $600. . . ." During this conversation appellant also stated, "Well, he [Curtis Ward] was in on it, too, he set it up."

### Admissibility of the Monitored Conversation

■ The trial court correctly ruled that the monitoring of the conversation between appellant and his accomplice after they had been taken into

---

[1]In denying defendant Califano's motion to strike this testimony as hearsay, the magistrate ruled that it would be received only in relation to the issue as to probable cause for his arrest. No motion to strike was made when the cause was submitted to the trial court on the preliminary hearing transcript.

custody involved no violation of their constitutional rights and that the incriminating content of the conversation was admissible in evidence.

In *People* v. *Chandler,* 262 Cal.App.2d 350 [68 Cal.Rptr. 645] (cert. den. 393 U.S. 1043 [21 L.Ed.2d 591, 89 S.Ct. 670]), the same contention as that now advanced by appellant was rejected. Chandler contended that his constitutional right of privacy had been violated when the police used an electronic device to record a conversation between him and his accomplice while they were alone in a police car in which they had been placed after their arrest. The following quotation from the *Chandler* decision at pages 355-356 provides a complete answer to the assignment of error now under consideration:

"Defendant also claims a violation of his constitutional right of privacy in the recording of the conversation in question. It is now settled law that an inmate of a jail or prison may not successfully complain of such a recording even if its taking was not known to him at the time. In *People* v. *Miller,* 252 Cal.App.2d 877, 881 (fn. 2) [60 Cal.Rptr. 791] we said: 'It is well established, moreover, "that a jail shares none of the attributes of privacy of a home, an automobile, an office or a hotel room" (*Lanza* v. *New York,* 370 U.S. 139, 143 [8 L.Ed.2d 384, 387, 82 S.Ct. 1218]; that inmates of prisons do not have the usual array of federal and state constitutional rights guaranteed to nonincarcerated citizens. (*Price* v. *Johnston,* 334 U.S. 266, 285 [92 L.Ed. 1356, 1369, 68 S.Ct. 1049]; *In re Ferguson,* 55 Cal.2d 663, 670-671 [12 Cal.Rptr. 753, 361 P.2d 417]; *Davis* v. *Superior Court,* 175 Cal.App.2d 8, 20 [345 P.2d 513]; *People* v. *Hernandez,* 229 Cal.App.2d 143, 149 [40 Cal.Rptr. 100]); and that prison authorities may subject inmates to intense surveillance and search unimpeded by Fourth Amendment barriers. (*Lanza* v. *New York, supra; People* v. *Hernandez, supra.*) In *People* v. *Morgan,* 197 Cal.App.2d 90, 92-94 [16 Cal.Rptr. 838] (cert. den. 370 U.S. 965 [8 L.Ed.2d 830, 82 S.Ct. 1606]) it was held that an electronic recording of conversation between a county jail prisoner and his sister was not an illegal search and seizure nor an unlawful invasion of the prisoner's privacy. The court stated as follows: "A man detained in jail cannot reasonably expect to enjoy the privacy afforded to a person in free society. His lack of privacy is a necessary adjunct to his imprisonment." (P. 93.) In *People* v. *Lopez,* 60 Cal.2d 223, 248 [32 Cal.Rptr. 424, 384 P.2d 16], it was held that "Except only insofar as concerns consultation with his attorney in a room designated for that purpose, a prisoner has no right of privacy in a jail." ' (See also *People* v. *Apodaca,* 252 Cal.App.2d 656, 658-659 [60 Cal.Rptr. 782].) Reasonably the right of defendant to privacy while under valid arrest in a police car can be no greater than if he were confined in jail."

■ By the same parity of reasoning, the right of appellant to privacy while under valid arrest and detention in a police building can be no greater than if he were confined in jail or in a police car.

Appellant's reliance upon the decision in *Katz* v. *United States,* 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507], is misplaced. In that case it was held that the attaching by FBI agents of an electronic listening and recording device to the outside of a public telephone booth from which the petitioner placed his call constituted a violation of his rights under the Fourth Amendment. We find nothing in the *Katz* decision which contradicts any of the principles of law stated in our quotation from *People* v. *Chandler, supra.* In his brief appellant has stated that the effective test with respect to the permissibility of electronic surveillance as established by the *Katz* decision is twofold: "First, that the overheard person has exhibited an actual 'subjective' expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.' "

■ Assuming the applicability of the principles enunciated in *Katz* notwithstanding the obvious distinguishing features of that case, the rationale of the decision supports the ruling of the trial court in this case. The statement of the defendant Totoro at the beginning of the monitored conversation that "They [the police] are probably listening right now," followed as it was by defendants' laughter, clearly provided a sufficient basis for a reasonable finding that neither participant in the conversation entertained any subjective expectation of privacy. In the context of the entire record it is evident that the defendants felt that they had nothing to lose by engaging in their self-incriminating conversation, notwithstanding their supposition that the police were listening, since Totoro previously had made a full confession of his guilt and since appellant, fully conscious of his own guilt, quite naturally assumed that he already was hopelessly implicated.

■ Relying upon *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], and *People* v. *Fioritto,* 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625], appellant argues that his rights were violated by the police when they placed him and his accomplice in the closed interview room for the purpose of listening to their conversation after appellant had stated that he wished to speak to an attorney. The fallacy in this argument is self-evident. The incriminating statements made in the course of this conversation were not responsive to any process of interrogation. ■ As stated in *People* v. *Fioritto, supra,* at page 718: "As [*Miranda*] makes plain, the procedural safeguards therein come into play only where 'custodial interrogation' is involved, and by 'custodial interrogation, we mean questioning initiated by law enforcement offi-

cers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' . . ."

In *People* v. *Ireland,* 70 Cal.2d 522, 537 [75 Cal.Rptr. 188, 450 P.2d 580], it was stated that "even a defendant in *custody* might make statements admissible under *Miranda* if it were shown that such statements were the result of the defendant's own initiative and did not arise in a context of custodial *interrogation.*"

■ The conversation between appellant and Totoro in the interview room transpired after they had been placed under arrest and after they had been fully advised of their constitutional rights. There is no suggestion, nor is there any basis for a suggestion, that Totoro was acting as an agent of the police or that it was his purpose to cooperate with the police in securing evidence against appellant. Since the incriminating statements were not elicited by any form of police interrogation, they must be classified as voluntary like the statements held admissible in *People* v. *Chandler, supra,* 262 Cal.App.2d 350, and in *People* v. *Boulad,* 235 Cal.App. 2d 118 [45 Cal.Rptr. 104].

### Sufficiency of the Evidence

Appellant's contention that the evidence is insufficient rests upon two untenable premises. First, he argues that the statements made by him in his monitored conversation with his codefendant are "subject to any one of a number of interpretations, some innocent and some nefarious." The futility of this argument is self-evident. Indeed it is self-defeating because it is pregnant with the concession that his statements reasonably could be construed as self-incriminating. Considering this conversation in its entirety and in the light of the attendant circumstances, it appears to us that the trial court adopted the most reasonable, if not the inescapable, conclusion that appellant's statements clearly and definitely implicated him as a participant in the burglary.

The second premise of appellant's attack upon the sufficiency of the evidence is indicated by the following quotation from his brief: "There is some other evidence wherein Co-Defendant made certain statements which purport to inculpate Appellant. However, any statement made by the Co-Defendant, who, for the purposes of this case must be considered Appellant's accomplice, is insufficient to support the conviction."

Except for the incriminating content of the monitored conversation between Totoro and appellant, the only evidence of an extrajudicial statement of the codefendant tending to incriminate appellant is found in the

testimony of the witness Purgason. He testified that in a conversation between his father and Totoro in his presence, Totoro said that "he felt that he should take all of the blame for the burglary, seeing as how he set it up and Califano had just followed out his orders." No objection was made to the question which elicited this testimony and there was no motion to strike it. Other extrajudicial statements of Totoro tending to incriminate appellant were either stricken by the magistrate or were received only in relation to the issue as to probable cause for his arrest. ■ However, accepting appellant's premise that there was accomplice testimony requiring corroboration, the evidence of appellant's extrajudicial statements supplied it. (*People* v. *Ward*, 266 Cal.App.2d 241, 260 [72 Cal.Rptr. 46], and decisions cited.)

## Legality of Appellant's Arrest

Appellant's contention that his arrest was illegal because he was arrested in Orange County by police officers employed by the City of Long Beach deserves only the briefest consideration. Penal Code section 817, as amended in 1967, was in effect on June 6, 1968, when appellant was arrested. In pertinent part the then effective section provided as follows: "A peace officer is the . . . policeman of a city or town . . . The authority of a peace officer extends to any place in the state (a) as to a public offense committed or which there is probable cause to believe has been committed within the political subdivision that employs him. . . ."[2]

■ In the present case the arresting officers knew that the burglary had been committed within the City of Long Beach and it is undeniable that they had probable cause to believe that appellant had been a participant in the commission of this crime.

Moreover, and quite apart from the authority vested in the officers by the statutory provision, they would have had the power to arrest appellant. ■ "An officer's power of arrest, when acting beyond the limits of the geographical unit by which he is appointed, becomes that which is conferred upon a private citizen in the same circumstances." (*People* v. *Martin*, 225 Cal.App.2d 91, 94 [36 Cal.Rptr. 924].) Penal Code section 837 provides that "A private person may arrest another: . . . 2. When the person arrested has committed a felony, although not in his presence. 3. When a felony has been in fact committed, and he has reasonable cause for believing the person arrested to have committed it." ■ Here the arresting officers knew that a felony had been committed and had more

---

[2]Section 817 was repealed and section 830.1 was enacted by Statutes of 1968, chapter 1222, section 1.

than reasonable cause to believe that appellant was involved as a principal in its commission.

The order is affirmed.

Roth, P. J., and Wright, J, concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 15, 1970. Wright, C. J., did not participate therein. Peters, J., was of the opinion that the petition should be granted.